BRADLEY BLACKHAM (8703)
JASON DUPREE (17509)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
bblackham@agutah.gov
jdupree@agutah.gov
*Attorneys for Defendant Diedre Henderson*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH DEMOCRATIC PARTY and JOSHUA HARDY,<br><br>        Plaintiff(s),<br><br>v.<br><br>DIEDRE M. HENDERSON, in her Official Capacity as Lieutenant Governor of Utah, and JOEL FERRY, individually and in his Official Capacity as acting director of the Utah Department of Natural Resources,<br><br>        Defendant. | **DEFENDANT DIEDRE HENDERSONS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:22-cv-00581<br><br>Judge Jill N. Parrish |

Defendant Diedre M. Henderson, in her Official Capacity as Lieutenant Governor of

Utah, submits this Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. iii

INTRODUCTION ....................................................................................................................... 1

STATEMENT OF FACTS .......................................................................................................... 1

   The Parties ................................................................................................................................ 1

   Ferry and Hardy Win Their Parties' Nominations for the House District 1 Election.................. 2

   Plaintiffs Drag Their Feet to this Litigation............................................................................... 2

   Procedural History ................................................................................................................... 4

LEGAL STANDARD................................................................................................................... 5

ARGUMENT ............................................................................................................................... 6

    1.   The Relief Plaintiffs Seek is Disfavored ....................................................................... 6

    2.   Plaintiffs Have Not Established a Substantial Likelihood on the Merits........................ 7

    2.1.   There is No Private Right of Action for the Hatch Act ............................................... 8

    2.2.   Plaintiffs' First Amendment Rights Have Not Been Burdened .................................. 9

    2.3.   The Election Code Does Not Create Any Classifications .......................................... 15

    2.4.   Plaintiffs Have Not Established Any Due Process Rights Implicated ....................... 16

    3.   The Threatened Harm to the State Outweighs the Threatened Harm to Plaintiffs ........ 18

    3.1.   Ballot Creation and Printing Issues ......................................................................... 18

    3.2.   Ballots Must Soon Be Mailed Out Overseas ........................................................... 19

    3.3.   Plaintiffs' Delay Prejudices the State's Ability to Defend against Their Claims....... 20

    4.   It Is in The Public Interest to Deny Plaintiffs' Motion ................................................. 21

    5.   A Bond Should be Required ......................................................................................... 22

CONCLUSION............................................................................................................................ 22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abiff v. Virgin Islands Legislature*, 216 F. Supp. 2d 455 (D.V.I. 2002) ......................................... 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................ 7

*Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067 (10th Cir. 2009) ............... 5

*Brooks v. Nacrelli*, 331 F. Supp. 1350 (E.D. Pa. 1971) ..................................................................... 8

*Brown v. Community Action Org. Inc.*, 2005 WL 2412817 (W.D.N.Y. Sept. 29, 2005) ................. 8

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............................................ 15

*Connolly v. Cnty. of Hudson*, 2011 WL 2489815 (D.N.J. June 21, 2011) ........................................ 8

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) ..................................................... 17

*Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331 (W.D. Pa. 2020) ....................10, 12

*Douglas v. Niagara Cnty. Bd. of Elections*, 2007 WL 3036809 (W.D.N.Y. Oct. 16, 2007) ......... 17

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .................................................................................. 6

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ............................................................................... 9

*Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262 (N.D. Fla. 2021) ................................... 9

*Frank v. Walker*, 574 U.S. 929 (2014) ............................................................................................. 21

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792 (10th Cir. 2019) ......... 6

*Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012) ......................................................................... 17

*Heideman v. So. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ..................................................... 5

*Hill v. Kemp*, 645 F. Supp. 2d 992 (N.D. Okla. 2009) .................................................................... 14

*Jicarilla Apache Nation v. Rio Arriba Cnty.*, 440 F.3d 1202 (10th Cir. 2006) ............................. 16

*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210 (10th Cir. 2011) ........................................ 16

*Kentucky v. Graham*, 473 U.S. 159 (1985) ....................................................................................... 2

*Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995) ................................................................................ 4

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..................................................................................... 9

*Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) ..................................... 9

*Powers v. Harris*, 379 F.3d 1208 (10th Cir. 2004) ......................................................................... 15

*Price–Cornelison v. Brooks*, 524 F.3d 1103 (10th Cir. 2008) ........................................................ 13

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ........................................................................................... 21

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) ............................ 21

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ......................................................... 6

*Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008) .......................................................... 17

*Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056 (7th Cir. 2020) ................. 4, 10

*Supreme v. Kansas State Elections Bd.*, 2018 WL 3329864 (D. Kan. July 6, 2018) ....................... 17

*The American Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) ...................... 13

*Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018) ..................................................... 9

*Veasy v. Perry*, 574 U.S. 951 (2014) ............................................................................................... 21

*Willowbrook v. Olech*, 528 U.S. 562 (2000) .................................................................................... 16

*Zia Shadows, LLC v. City of Las Cruces*, 829 F.3d 1232 (10th Cir. 2016) ................................... 15

## Statutes

5 U.S.C. § 1504 ............................................................................................................................ 8, 14

5 U.S.C. § 1505 ............................................................................................................................ 8, 14

5 U.S.C. § 1508 .................................................................................................................................. 8

52 U.S.C. § 20301 ............................................................................................................................ 19

U.S. Const. Amend XIV ................................................................................................................... 15

Utah Code § 20A-1-501 ..................................................................................................................... 5

Utah Code § 63A-17-904......................................................................................................... 4

Regulations

Utah Admin. Code R477-9-4............................................................................................... 4, 14

## **INTRODUCTION**

Plaintiffs are seeking extraordinary relief.  Plaintiffs here are a political party and its nominee for House District 1, a district in the Utah Legislature.  Plaintiffs want this federal court to mandate that the Lieutenant Governor remove Plaintiffs' opposition party candidate from the ballot of a state election, just days before ballots are sent out to military members overseas. Plaintiffs sat on their claims for months doing nothing, and now come to this Court asking for immediate, drastic relief.  The State has a compelling interest in running an election in a timely and orderly fashion.  The public's interest is not served by last minute removals of candidates based on unconfirmed allegations.  Worse yet, Plaintiffs' Motion does little to explain how there's any merit to their claims.  The Court should deny Plaintiffs' Motion for Preliminary Injunction.

## **STATEMENT OF FACTS**

### *The Parties*

Plaintiffs in this case are the Utah Democratic Party and Joshua Hardy.  To support its mission to elect its party members to office, the Utah Democratic Party ("UDP") holds press conferences, issues press releases, raises funds, and conducts voter mobilization efforts throughout Utah.[1]  Plaintiff Joshua Hardy is a member of the UDP.[2]  He is also the UDP candidate for House District 1, a district of the Utah House of Representatives.[3]

---

[1] Compl. ¶ 3.
[2] *Id*. ¶ 6.
[3] *Id*. ¶ 6.

Defendant Diedre Henderson is the Lieutenant Governor of Utah.[4]  Plaintiffs sue

Defendant Henderson in her official capacity.[5]  Defendant Joel Ferry is the current acting

director of the Utah Department of Natural Resources and also the Republican nominee for

House District 1.[6]

### *Ferry and Hardy Win Their Parties' Nominations for the House District 1 Election*

In 2018, Defendant Ferry and Plaintiff Hardy ran against each other for the House

District 1 seat.[7]  Ferry won.[8]  Ferry ran for reelection in 2020 against Hardy's wife.[9]  Ferry won

again.[10]  In April 2022, the Republican delegates renominated Ferry as the candidate for House

District 1.[11]  Hardy is the UDP nominee.

On June 24, 2022, Utah Governor Spencer Cox appointed Ferry to Director of the

Department of Natural Resources.[12]  That same day, Ferry assumed the position as Acting

Director.[13]  Plaintiffs allege that the Department of Natural Resources receives federal loans and

grants, and further allege that Ferry's director salary is paid completely by federal funds.[14]

### *Plaintiffs Drag Their Feet to this Litigation*

Though the alleged triggering event giving rise to Plaintiffs' claims occurred on June 24,

2022, the Complaint is absent of Plaintiffs taking action any time soon after that.  According to

---

[4] *Id*. ¶ 7.
[5] "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).
[6] Compl. ¶ 9.
[7] *Id*. ¶ 16.
[8] *Id.*
[9] *Id*. ¶ 18.
[10] *Id.*
[11] *Id*. ¶ 20.
[12] *Id*. ¶ 21.
[13] *Id*. ¶ 26.
[14] *Id*. ¶ 33-34.

the Complaint, it was "local news" to raise Defendant Ferry's alleged separation of powers violation in July 2022.[15]  The Complaint does not allege that Plaintiffs took any action to contest Ferry's candidacy or raise the issue prior to the local news report.

And while local news brought up the issue in July, Plaintiffs still waited another month before taking even non-legal action.  Plaintiffs waited until August 17 to send a letter to Defendant Henderson and Ryan Cowley, Director of Elections.[16]  Plaintiffs requested that Ferry either resign from the state legislature and remove his name from the ballot, or that Henderson disqualify Ferry from appearing on the ballot.[17]  Plaintiffs also appeared to be in no rush to want to receive a response from Henderson's office so that Plaintiffs could take further action if needed.  Plaintiffs asked Henderson to let them know by August 31 if she would remove Ferry from the ballot.

Acting with more urgency that Plaintiffs, Defendant Henderson responded on August 24. Henderson stated that there is no statutory basis on which she may affirmatively disqualify a candidate in these circumstances.[18]  With the Lieutenant Governor's position in hand, Plaintiffs still waited two more weeks before filing this lawsuit.

On August 26, 2022, Ferry resigned from his seat in the legislature for the current term.[19] Ferry publicly stated that he does not plan to remove his name from the ballot for the upcoming November election.[20]  Ferry continues to serve as the acting executive director of the Department

---

[15] *Id.* ¶ 23.
[16] *Id.* ¶ 14.
[17] Compl. ¶ 24; Ex. 1 to Compl.
[18] Compl. ¶ 25.
[19] *Id.* ¶ 28.
[20] *Id.* ¶ 30.

of Natural Resources.[21]  Plaintiffs allege that the Utah Senate will vote on Ferry's confirmation

in late September 2022.[22]

### *Procedural History*

Plaintiffs filed their lawsuit in this Court on September 7.  Plaintiffs raise a single cause

of action under § 1983 and a request for a declaratory judgment and injunctive relief.  Plaintiffs

claim that Defendant Ferry is violating the Hatch Act, alleging that his Department of Natural

Resources position is paid by federal funds.  Plaintiffs further claim that Defendant Henderson

violated Plaintiffs' federal constitutional rights by not removing Ferry from the ballot in light of

Ferry's alleged Hatch Act violation and numerous alleged Utah statutory and constitutional

violations.[23]

The Court, in an order on September 12, declined to exercise supplemental jurisdiction

over Plaintiffs' state claims; specifically, claims arising under Utah Code § 63A-17-904 (the

"Little Hatch Act"), Utah Admin. Code R477-9-4, and under multiple provisions of the Utah

constitution.  Accordingly, Plaintiffs' only remaining claims are for violation of the federal

Hatch Act, First Amendment, Due Process Clause, and Equal Protection Clause of the U.S.

Constitution.

---

[21] *Id*. ¶ 33.

[22] *Id*. ¶ 28.

[23] Defendant interprets Plaintiffs' federal constitutional claim as alleging that Henderson violated Plaintiffs' federal constitutional rights by ignoring Ferry's violation of the Hatch Act, little Hatch Act, and Utah constitution.  To the extent Plaintiffs' claim rests on an underlying violation of Utah law (little Hatch Act and state constitution), this is not a basis for a valid claim for violation of federal constitutional rights.  *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").  Therefore, the only possible claim remaining is based on Defendant Henderson failing to remove Ferry based on the alleged Hatch Act violation.

Before the Court is Plaintiffs' Motion for Preliminary Injunction.  Plaintiffs seek a declaratory judgment that Defendant Henderson's refusal to remove Defendant Ferry from the ballot violates Plaintiffs' federal constitutional rights.  Plaintiffs further seek an order enjoining Defendant Henderson from printing or publishing any official ballot with Ferry's name on it. Plaintiffs also raise an argument and seek relief in the alternative.  Plaintiffs contend that to the extent Utah Code § 20A-1-501 (the "Election Code") prohibits the removal for Ferry's name because of an alleged violation of the Hatch Act, the Election Code is unconstitutional as applied to Plaintiffs.  In essence, Plaintiffs challenge both Defendant Henderson's actions and the Election Code as unconstitutional.

## LEGAL STANDARD

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." *Heideman v. So. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (internal quotation marks and citation omitted).  Before a court may enter a preliminary injunction, the moving party must establish that: 1) the movant is substantially likely to succeed on the merits; 2) the movant will suffer irreparable injury if the injunction is denied; 3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and 4) the injunction would not be adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).  The movant must prove all four factors. *Id.*  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation marks and citation omitted).

5

"[C]ourts should be especially cautious when granting [a disfavored] injunction that requires the nonmoving party to take affirmative action – a mandatory preliminary injunction" and require the moving party to "make a heightened showing of the four factors." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208-09 (10th Cir. 2009).

## ARGUMENT

This Court should deny Plaintiffs' Motion. Plaintiffs' Motion is subject to a heightened standard because Plaintiffs seek a type of injunction that is disfavored. Turning to the preliminary injunction factors, Plaintiffs have not established they are substantially likely to succeed on the merits, that their threatened injury outweighs the injury to Defendants, or that the injunction would not be adverse to the public interest.

1.    The Relief Plaintiffs Seek is Disfavored

Injunctions are disfavored if they: 1) mandate action (rather than prohibiting it); 2) change the status quo; or 3) grant all the relief the moving party could expect from a trial win. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). Under this heightened standard, "the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: she must make a 'strong showing' that these tilt in her favor." *Id.* (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

This heightened standard applies here. The injunction Plaintiffs seek is disfavored. Plaintiffs seek to alter the status quo. Defendant Ferry is on the ballot as the Republican nominee. Plaintiffs seek to change that. Plaintiffs also ask the Court to mandate action on the part of the Lieutenant Governor. Plaintiffs want to the Court to order Lieutenant Governor

Henderson to remove Ferry from the ballot.  Therefore, a heightened standard of proof applies to what already is an extraordinary form of relief.  Plaintiffs have not met this burden.

2.    <u>Plaintiffs Have Not Established a Substantial Likelihood on the Merits</u>

It is Plaintiffs' burden to demonstrate a substantial likelihood on the merits.  Plaintiffs have done little to meet that burden.  While Plaintiffs' motion is heavy on long quotes of the law, the motion is short on actual specific arguments on the merits of their claims.  Indeed, much of the motion does not do "more than . . . unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This is insufficient.  On that basis alone, the Court can find that Plaintiffs have not established a substantial likelihood on the merits.

But even digging into Plaintiffs' claims, it's clear these claims have no merit.  There is no private right of action for the Hatch Act; Plaintiffs cannot bring that claim.  As to their First Amendment claim, Plaintiffs have not demonstrated how Defendants have burdened Plaintiffs' right to vote or associate.  When it boils down to it, Plaintiffs' Complaint is that the State has not done more to restrict someone else's access to the ballot.  That's not a burden on Plaintiffs' First Amendment rights.

Plaintiffs' equal protection claim fares no better.  The Election Code does not create any classifications, as to implicate the Equal Protection Clause.  And Plaintiffs have not brought forth a similarly situated comparator that Lieutenant Governor Henderson treated differently, as is required to make a "class of one" claim.  Finally, Plaintiffs have not established that their due process rights have been violated.  Plaintiffs have not established a substantial likelihood on the merits.  The Court should deny the Motion.

2.1.   There is No Private Right of Action for the Hatch Act

Plaintiffs' Motion first addresses an alleged violation of the Hatch Act.  Plaintiffs cannot establish a substantial likelihood of success on this claim because there is no private right of action for the Hatch Act, and this Court does not have jurisdiction to hear this claim.

As a matter of law, Plaintiffs cannot assert a private action under the Hatch Act.  Under the Act's provisions, a federal agency reports suspected violations of the Act to the Office of Special Counsel.  5 U.S.C. § 1504.  The Office of Special Counsel files a complaint with the Merit Systems Protection Board.  Id.  The employee has the right to contest the charges at a hearing before the Board.  5 U.S.C. § 1505.  The Board then determines if there has been a violation of the Act and whether removal from employment is warranted.  Id.  A party aggrieved by an order of the Board may petition for judicial review in federal district court.  5 U.S.C. § 1508.  Congress therefore vested exclusive enforcement authority in the Merit Systems Protection Board.

"The provisions of the Hatch Act, as confirmed by courts . . ., make clear that the Act does not make a violation thereof privately actionable." Connolly v. Cnty. of Hudson, No. CIV.A. 09-4509 SRC, 2011 WL 2489815, at *6 (D.N.J. June 21, 2011) (unpublished).  To permit Plaintiffs "to bring an action based on alleged Hatch Act violations would be to permit a bypass of the administrative procedure set forth by Congress." Brooks v. Nacrelli, 331 F. Supp. 1350, 1354 (E.D. Pa. 1971), aff'd, 473 F.2d 955 (3d Cir. 1973).  Plaintiffs cannot bring a claim under the Hatch Act, as there is no private right of action under the Act.[24]

---

[24] At least one district court has found that a plaintiff's continued pursuit of a private cause of action for an alleged Hatch Act violation was so frivolous that it awarded attorney fees to the defendants for having to defend against it. See Brown v. Community Action Org. Inc., No. 03-cv-295S, 2005 WL 2412817 (W.D.N.Y. Sept. 29, 2005).

Furthermore, "district courts have jurisdiction to consider only the decisions of the Board." *Abiff v. Virgin Islands Legislature*, 216 F. Supp. 2d 455, 460 n.7 (D.V.I. 2002). There has been no investigation, finding, or charge filed by the Office of Special Counsel, and there has been no determination made by the Merit Systems Protection Board. Plaintiffs cannot bring this claim to this Court. Plaintiffs' Hatch Act claim fails as a matter of law.

### 2.2.    Plaintiffs' First Amendment Rights Have Not Been Burdened

Plaintiffs cannot establish a substantial likelihood of success on their First Amendment claims because the State has not burdened their right to vote or right to associate. Usually, the "*Anderson–Burdick* balancing test" governs the constitutionality of electoral regulations. *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018). Under this "sliding scale" test, a regulation that imposes severe burdens must be narrowly tailored to serve a compelling state interest. *Id.* (citations omitted). When regulations impose lesser burdens, "a State's important regulatory interests" are sufficient justification. *Id.* (citations omitted).

However, under this framework, "a rational basis standard applies to state regulations that do not burden the fundamental right to vote." *Fish v. Schwab*, 957 F.3d 1105, 1124-25 (10th Cir. 2020) (quoting *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012)). It is Plaintiffs' obligation to demonstrate that the election regulation burdens their right to vote. *See Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1287 (N.D. Fla. 2021) ("Under *Anderson-Burdick*, when plaintiffs fail to show that the law creates more than a de minimis burden, rational basis review applies. And if a plaintiff offers no evidence that the challenged law burdens the right to vote, the court cannot assume that such a burden exists.").

Here, Plaintiffs have not demonstrated a burden on their First Amendment rights and therefore rational basis review applies.  First, Plaintiffs have not established that the State has burdened UDP's right to vote.  The UDP's candidate for House District 1 – Plaintiff Hardy – is on the ballot.  Members of the Utah Democratic Party are able to vote for their nominated candidate, Plaintiff Hardy, if they so choose.  Plaintiffs have not demonstrated how the State will prevent any member of UDP from voting.  The State hasn't "hinder[ed] the exercise of the franchise," or "in any way limit[ed] voters' range of choices in the voting booth – voters can still cast ballots for whomever they wish[.]"  *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 414 (W.D. Pa. 2020) (citations and quotation marks omitted).

The same applies to Plaintiffs' right to association.  "Plaintiffs do not allege how they were prevented from associating or with whom they were prevented from associating."  *Shipley*, 947 F.3d at 1063.  The State has not prevented UDP, in any way, from holding "press conferences" or "press releases," or conducting "political advertising" and "phone banking."[25]  Plaintiffs have not shown that the State has burdened their right to freedom of association.

The true nature of Plaintiffs' claim is not a violation of their First Amendment rights; rather, Plaintiffs are complaining that Defendant Henderson has not done more to restrict *someone else's* rights.  Courts have held that there is no constitutional violation under such theory.  Two recent cases out of Pennsylvania from the 2020 presidential election highlight this point well.

In *Donald J. Trump for President, Inc. v. Boockvar*, the plaintiffs sued the secretary of Pennsylvania and seven Pennsylvania counties.  502 F. Supp. 3d 899, 907 (M.D. Pa.), aff'd sub

---

[25] Compl. ¶ 3.

nom. 830 F. App'x 377 (3d Cir. 2020), and appeal dismissed sub nom. No. 20-3384, 2021 WL 807531 (3d Cir. Jan. 7, 2021).  The Pennsylvania election code allows mail-in voting.  *Id.* at 907. Some of the election code regulates mail-in voting, such as that voters must place their ballots in secrecy envelopes.  *Id.*  The code does not refer to the practice of "notice and cure," which involves notifying mail-in voters who submitted procedurally defective ballots of deficiencies and allowing them to cure their ballots.  *Id.*  Under this practice, notified voters can then cure their ballots and have their vote counted by submitting a provisional ballot.  *Id.*

Counties are not required to adopt a notice-and-cure policy, and it was an open question whether such a policy is forbidden.  *Id.*  With the question up in the air, some counties chose to implement a notice-and-cure procedure, but other counties did not.  *Id.*  The plaintiffs in the case had their ballots cancelled in the 2020 presidential election because they were in counties without notice-and-cure procedures and failed to follow all mail-in voting requirements.  *Id.* at 908.  The plaintiffs claimed a violation of equal protection.  *Id.* at 910.

The general thrust of their claims was that the secretary, by failing to prohibit counties from implementing a notice-and-cure policy, and the counties by adopting the policy, created a standardless system that unconstitutionally discriminated against the plaintiffs.  *Id.* at 918.

The district court found that the defendants' conduct did not impose any burden on the plaintiffs' right to vote.  *Id.* at 919.  Therefore, the court applied rational basis review.  The court noted that the counties actually lifted a burden on the right to vote in their respective counties by implementing a notice-and-cure procedure.  *Id.*  "Expanding the right to vote for some residents of a state does not burden the rights of others."  *Id.* (citation omitted).  "And Plaintiffs' claim cannot stand to the extent that it complains that the state is not imposing a restriction on someone

11

else's right to vote." *Id.* (citation and quotation marks omitted).  The court therefore applied

rational basis, and found that the notice-and-cure procedure satisfied that standard.

In another challenge to that presidential election, the plaintiffs asserted "that the use of

'unmanned' drop boxes is unconstitutional." *Donald J. Trump for President*, 493 F. Supp. 3d at

350.  About 26 counties in Pennsylvania planned to use drop boxes during the election.  *Id.* at

356.  Of those, nine counties intended to staff the drop boxes with officials, but 17 counties

intended to leave the drop boxes unattended and use video surveillance instead.  *Id.*  The

plaintiffs argued that to be "secure," drop boxes must be "attended" by an election official at all

times.  *Id.* at 360.  The plaintiffs thus claimed that the unattended drop boxes allow for an

unacceptable risk of voter fraud and when it occurs, it will dilute the votes of all lawful voters.

*Id.* at 359.

The court found that the plaintiffs did not establish a burden on their right to vote.

"Defendants' failure to implement a mandatory requirement to 'man' drop boxes doesn't directly

infringe or burden Plaintiffs' rights to vote at all."  *Id.* at 391.  The court therefore applied

rational basis review.

Besides finding no burden on the right to vote and thus applying rational basis review, the

court also explained another reason why the *Anderson-Burdick* test was ill-fitted for the

plaintiffs' claims.  "Typically, *Anderson-Burdick* is invoked where the government takes some

direct action to burden or restrict a plaintiff's right to vote."  *Id.* at 393.  But in that case, the

plaintiffs complained that the state burdened the right to vote by "inaction."  *Id.*  In other words,

the plaintiffs claimed that their right to vote was burdened by the state "not imposing enough

regulation to secure the voting process it has adopted," which will dilute their votes.  *Id.*  The

court found that the nature of the plaintiffs' claim made it difficult to apply the *Anderson-Burdick* test. That test is normally undertaken to "assess the government's interest in taking a specific action that imposed burdens on the right to vote." *Id.* But "[i]t is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more[.]" *Id.*

The nature of Plaintiffs' claim here is akin to the claims brought in these Pennsylvania presidential election cases. Plaintiffs here are not alleging that Defendants' conduct imposes any burden on Plaintiffs' right to vote or associate. Plaintiffs are not asking the State to remove restrictions. Plaintiffs are asking the State to impose more restrictions on their opposing candidate. But Defendant Henderson's inability to remove Defendant Ferry from the ballot "doesn't directly infringe or burden Plaintiffs' rights to vote at all." 493 F. Supp. 3d at 391. And Plaintiffs' claim cannot stand to the extent it complains that the State is not imposing a restriction on someone else's access to the ballot, someone else's right to vote for another candidate, or on Plaintiffs' opposition party, which, "like all political parties, has a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences." *Cox,* 892 F.3d at 1081 (citation and quotation marks omitted). Plaintiffs have not demonstrated that Defendants have burdened Plaintiffs' First Amendment rights. This Court should therefore apply rational basis review.

Applying rational basis review, both Defendant Henderson's actions and the Election Code pass muster. A statute will be struck down under rational basis review only if it is not rationally related to a legitimate state interest. *The American Civil Liberties Union of New Mexico v. Santillanes,* 546 F.3d 1313, 1319 (10th Cir. 2008); *Price–Cornelison v. Brooks,* 524

13

F.3d 1103, 1109 (10th Cir. 2008).  "On rational basis review, the burden is on the party attacking

the statute to show that there is no rational relationship between the statute and a legitimate state

interest." *Hill v. Kemp*, 645 F. Supp. 2d 992, 1007-08 (N.D. Okla. 2009).

Plaintiffs have not met their burden here.  Defendant Henderson declined to remove

Defendant Ferry from the ballot for an alleged violation of the Hatch Act, and the Election Code

does not give her the authority to do so, because there are already alternative mechanisms of

enforcement in place, and alternative remedies for removing someone from the ballot.

Sufficient mechanisms already exist to investigate and make factual findings regarding

alleged Hatch Act violations.  Congress empowered the Special Counsel to "investigate" and

"present . . . findings" regarding alleged violations.  5 U.S.C. § 1504.  The Special Counsel can

then file a charge before the Merit System Protection Board.  *Id.*  The Board then determines if

there has been a violation of the Act.  5 U.S.C. § 1505.  Furthermore, Utah Admin. Code R477-

9-4(2)(b) authorizes the Department of Human Resources Management to determine whether an

employee is covered under the Hatch Act.  The State has a legitimate interest in allowing these

agencies to conduct their own investigations and make their own findings.  Those agencies will

often be in a better position than the Lieutenant Governor would be to determine the funding

status of a certain employee position.

Furthermore, the Hatch Act provides for the proper remedy of an Act violation.  Under

the Hatch Act, if the Merit Systems Protection Board determines there has been a violation, the

Board then decides "whether the violation warrants the removal of the officer or employee from

his office or employment."  5 U.S.C. § 1505.  The Act does not provide for removal of the

candidate from the ballot.  Similarly, Utah Admin. Code R477-9-4(3)(a) provides that if the

14

employee files for candidacy and is covered by the Hatch Act, the State shall dismiss the employee from employment.  The State has a legitimate interest in following the same remedy that Congress provided for by federal statute.  This remedy allows the candidate to remain running for office, without the State running the risk of unnecessarily interfering with an election.  Plaintiffs cannot show a substantial likelihood of success on their First Amendment claim.

       2.3.    <u>The Election Code Does Not Create Any Classifications</u>

Plaintiffs have not demonstrated a substantial likelihood of success on their equal protection claim.  The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State . . . shall deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. Amend XIV*.  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  Only laws that create suspect classifications, based on factors such as race, alienage, national origin or gender, receive heightened scrutiny.  *Id*. at 440-41.

To the extent this claim challenges the Election Code, the code does not categorize based on a suspect class; therefore, the Court must apply rational basis review to determine whether the code passes constitutional muster.  *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004).  As demonstrated above, the code passes rational basis review.

To the extent this claim challenges Defendant Henderson's actions, this claim also fails.  An equal protection claim where a plaintiff does not allege discrimination based on membership in a protected class is a "class of one" claim.  *Zia Shadows, LLC v. City of Las Cruces*, 829 F.3d

1232, 1239 (10th Cir. 2016) (citations omitted).  To make a class-of-one claim, Plaintiffs must

show they were "intentionally treated differently from others similarly situated and . . . there is

no rational basis for the difference in treatment." *Kansas Penn Gaming, LLC v. Collins*, 656

F.3d 1210, 1216 (10th Cir. 2011) (quoting *Willowbrook v. Olech*, 528 U.S. 562 (2000)).

There are two elements to a class-of-one equal protection claim.  First, Plaintiffs must

establish that "others, 'similarly situated in every material respect' were treated differently." *Id.*

(quoting *Jicarilla Apache Nation v. Rio Arriba Cnty.*, 440 F.3d 1202, 1210 (10th Cir. 2006)).

The degree of similarity required between a plaintiff and comparator is heightened in class-of-

one cases.  *Id.* at 1218; *Jicarilla Apache*, 440 F.3d at 1212.  Second, Plaintiffs must establish that

the difference in treatment "was without rational basis." *Kansas Penn*, 656 F.3d at 1216.  This is

an objective standard: "if there is a reasonable justification for the challenged action, [courts] do

not inquire into the government actor's actual motivations." *Id.* (citation omitted).  The plaintiff

has the "substantial burden" of proving both elements. *Jicarilla Apache*, 440 F.3d at 1217.

Plaintiffs have not established a comparator, similarly situated in all aspects, that

Defendant Henderson treated differently.  Plaintiffs haven't even raised a comparator at all.  This

claim simply has no merit.  Plaintiffs cannot establish a substantial likelihood of success on their

equal protection claim.

### 2.4.   Plaintiffs Have Not Established Any Due Process Rights Implicated

Finally, the Complaint raises a claim of due process, "both substantive and procedural."[26]

Plaintiffs have not shown a substantial likelihood of success on either.  First, as to the procedural

due process claim.  The threshold inquiry in a procedural due process claim is whether the

---

[26] Compl. ¶ 52.

plaintiff possessed a protected liberty or property interest. *Guttman v. Khalsa*, 669 F.3d 1101, 1113 (10th Cir. 2012). Here, "Plaintiff[s] fai[l] to specifically identify the constitutionally protected interest of which Defendants allegedly deprived [them]." *Supreme v. Kansas State Elections Bd.*, No. 18-CV-1182-EFM, 2018 WL 3329864, at *5 (D. Kan. July 6, 2018) (unpublished). And courts have "concluded that a candidate for political office holds no property or liberty interest in an elected position." *Douglas v. Niagara Cnty. Bd. of Elections*, No. 07-CV-609A, 2007 WL 3036809, at *4 (W.D.N.Y. Oct. 16, 2007) (unpublished). *See also Supreme*, 2018 WL 3329864, at *5. Plaintiffs cannot demonstrate a protected property interest.

Turning to Plaintiffs' substantive due process claim. To the extent this claim challenges the Election Code, "[l]egislative action is tested under a two-part substantive due process framework." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). Under this test, courts first look to whether a right "relating to marriage, family life, child rearing, and reproductive choices" is implicated. *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008). Because such is not implicated here, the Court must "use a rational basis test." *Dias*, 567 F.3d at 1182. As demonstrated above, the code meets this test.

To the extent Plaintiffs' substantive due process claim challenges Defendant Henderson's actions, the "shocks the conscience" standard "is an inquiry reserved for cases challenging executive action." *Dias*, 567 F.3d at 1182. "Substantive due process prohibits only the most egregious official conduct, and even most intentionally inflicted injuries caused by misuse of government authority will not meet this standard." *Supreme*, 2018 WL 3329864, at *6 (citation and quotation marks omitted). Plaintiffs fall far short of demonstrating a likelihood of success on the merits this claim, as they have not pointed to any conduct that meets this high standard.

17

In sum, Plaintiffs have not demonstrated a substantial likelihood of success on the merits of any of their claims.  This Court should therefore deny Plaintiffs' Motion.

3.    The Threatened Harm to the State Outweighs the Threatened Harm to Plaintiffs

Plaintiffs' threatened injury does not outweigh the threatened harm to the State.  The state election machinery has already been set in motion, and only a short time remains before ballots are mailed out to military members stationed overseas.  Granting Plaintiffs' request would disrupt the election process.

3.1.    Ballot Creation and Printing Issues

The State has a compelling interest in conducting fair and orderly elections.  Plaintiffs seek to upend that by disrupting the process already set in motion.  On August 31, 2022, the Lt. Governor's Office certified to each county clerk the name of each candidate for elected office nominated under the Election Code.[27]  Defendant Ferry's name was included in the August 31 list of nominees included on the ballot as the Republican candidate for House District 1.[28]  Once the Lt. Governor's Office certified the names of candidates, the county clerks' offices assumed primary responsibility for preparing, printing, and mailing ballots to registered voters.[29]  The ballots for both Box Elder and Cache Counties are already in varying stages of being programmed, created, approved, and sent to the printing vendor.[30]  After a ballot is programmed, any change to the ballot in a single race requires the entire ballot to be reprogrammed and recreated.[31]

---

[27] Ex. 1, Decl. of Ryan Cowley ¶ 12.
[28] *Id.*
[29] *Id.* ¶ 13.
[30] *Id.* ¶ 15.
[31] *Id.* ¶ 16.

An order granting injunctive relief to Plaintiffs by which Ferry is removed from the ballot might necessitate recreation and reprogramming of all ballots in Box Elder and Cache Counties. Not only would it cost the counties more money to reprogram and reprint the ballot, it would cost the State valuable time in preparing for the election, which interferes with its interest in conducting an orderly election.

    3.2.    <u>Ballots Must Soon Be Mailed Out Overseas</u>

For U.S. citizens overseas, including members of the military, voting by absentee ballot may be the only practical means to exercise their right to vote.  The Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA") guarantees active-duty members of the military, their spouses and dependents, and other U.S. citizens residing overseas the right "to vote by absentee ballot in general, special, primary, and runoff elections for federal office." 52 U.S.C. § 20301.

The MOVE Act reaffirmed Congress' commitment to ensuring that UOCAVA voters have sufficient time to receive, mark, and return their ballots in time to be counted. *Id.*  To give these voters adequate time to vote, the MOVE Act amended UOCAVA to require that states send ballots to UOCAVA voters at least 45 days before an election if they receive a request for a ballot before then. *Id*. at § 20302.  The election is November 8.  The 45th day before that is September 24, a Saturday.  The county clerks' practice is to mail ballots to overseas voters on the last business day before the 45-day deadline, which here is Friday, September 23.[32]  Counties have been working to try to mail ballots as close to this deadline as possible.  Any further

---

[32] Ex. 1, Cowley Decl. ¶ 18.

disruption of this election calendar will jeopardize the State's ability to comply with the deadline of September 23, and jeopardize the right to vote for overseas citizens.

    3.3.    <u>Plaintiffs' Delay Prejudices the State's Ability to Defend against Their Claims</u>

Plaintiffs have been sitting on their claims for months doing nothing, and now come to this Court asking for immediate injunctive relief. Ferry won the Republican nomination for House District 1 in April 2022.[33] Governor Cox appointed Ferry for Director of Department of Natural Resources on June 24, and Ferry became acting director that day.[34] Therefore, Plaintiffs were on notice of their claims on June 24, 2022. Plaintiffs waited until September 7 to file their Complaint. After Ferry was appointed director, Plaintiffs did not nothing for two months. According to the Complaint, the local news media was more interested in this story than Plaintiffs were. Even when Plaintiffs finally got around to writing Defendant Henderson two months later, they were willing to give her plenty of time to respond, in no apparent rush to get litigation started. And after Defendant Henderson explained her position, Plaintiffs didn't exactly rush to this courthouse.

Because Plaintiffs waited so long, any ruling in their favor would effectively preclude the State from seeking appellate review, without virtually ensuring significant disruption to the upcoming election. If the Court orders the State to remove Defendant Ferry from the ballot, there is simply not enough time for appellate review of this Court's decision, given the need to finalize the ballots and mail them overseas, if there is even time to do that. Last-minute changes to the ballot increase the costs to the State and erode the public's confidence in elections. Such

---

[33] Compl. ¶ 20.
[34] Compl. ¶¶ 21, 26.

prejudice to the State outweighs any harm to Plaintiffs, especially given their delay in seeking relief.

4.    It Is in The Public Interest to Deny Plaintiffs' Motion

Supreme Court precedent makes clear that avoiding court-ordered eve-of-election changes to state election laws furthers the public interest. The Supreme "Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasy v. Perry*, 574 U.S. 951 (2014)).

That concern contributed to the Court's decision to stay a district court's order altering Wisconsin's statutory deadlines for mail-in voting because of the impact of Covid-19. *Id.* at 1207-08. That extraordinary remedy was necessary to preserve "[c]onfidence in the integrity of our electoral processes," which "is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.

The similarities between Plaintiffs' requested relief and the last-minute election orders the Supreme Court has cautioned against are apparent. After months of sitting on these claims, Plaintiffs seek an order from an Article III court to remove their opposition candidate from the ballot of a state election. Removing a candidate by judicial decree at this late hour, based on an unconfirmed allegation, will increase the risk of voter confusion, creating an "incentive to remain away from the polls." *Id.* at 4-5. This is the very type of serious disruption of the election process that the Supreme Court has not permitted. The Court should deny Plaintiffs' Motion.

5.      A Bond Should be Required

Reprinting the ballot for House District 1 would cost around $28,423.75.[35]  Accordingly, if the Court chooses to order an injunction, a requirement that Plaintiffs post a bond in that amount should accompany that order.

## CONCLUSION

For the reasons stated above, this Court should deny Plaintiffs' Motion.


RESPECTFULLY SUBMITED THIS 14th day of September, 2022.

OFFICE OF THE UTAH ATTORNEY GENERAL


/s/ *Jason Dupree*
BRADLEY BLACKHAM
JASON DUPREE
Assistant Utah Attorneys General
*Attorney for Defendant*

---

[35] Ex. 1, Cowley Decl. ¶ 21.